IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DAVID C. WARTH,

    Plaintiff,

v.

THOMAS WILLIAMSON,

  Defendant.

CIVIL ACTION FILE NO.
1:23-cv-05072-MLB

## DEFENDANT'S EXHIBITS TO STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

EXHIBIT A – David Warth Deposition Excerpts

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF GEORGIA

 3                      ATLANTA DIVISION

 4

 5   DAVID C. WARTH            )
           Plaintiff,         )
 6                            )
     v.                        )    CIVIL ACTION FILE NO.
 7                            )    1:23-cv-05072-MLB
     GWINNETT COUNTY PUBLIC    )
 8   SCHOOLS, GWINNETT COUNTY )
     SCHOOL POLICE, THOMAS     )
 9   WILLIAMSON, Individually )
     and in his official       )
10   capacity as an employee  )
     of Gwinnett County School)
11   Police, and BRITTNEY      )
     DEWEY, Individually and   )
12   in her official capacity )
     as an employee of         )
13   Gwinnett County Public    )
     Schools,                  )
14        Defendants.          )
     _____ )

15

16                 The Deposition of

17                  DAVID C. WARTH

18

19                 October 9, 2024

20                   10:00 a.m.

21

22            VIA ZOOM DEPOSITION

23

24          Tammy L. Gardner, CCR

25       Certified Court Reporter #2804
```

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 20

1    consequences for that conduct, though, correct?

2        A.    Correct.

3        Q.    Did you have any conflicts or problems

4    with other students in middle school?

5        A.    There was occasional teasing or bullying

6    on like a school bus, like school bus bullying.  I

7    remember a couple incidents which involved that,

8    involved name calling.  Occasionally I was hit a

9    few times, but I think that got sorted out like

10   through the school administration.

11       Q.    So you reported those kids that were

12   bullying you?

13       A.    Yes.

14       Q.    Okay.  And it was addressed?

15       A.    It was addressed.  Yes.

16       Q.    How many years do you think you endured

17   that bullying when you were in middle school?

18       A.    So that really started, I think, just for

19   one year, around like eighth grade.  So like around

20   2010 to 2011.

21       Q.    And, then, you went to Brookwood High

22   School after Crews.

23             Is that correct?

24       A.    That is correct.

25       Q.    And did you receive -- at some point at

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 21

1    Brookwood, you did receive special education

2    services.

3            Is that right?

4        A.    Yeah.  So around 2012, a decision was

5    made -- I did not make this decision, obviously,

6    but a decision was made by Brookwood Special Ed

7    Department, in which they placed me in the special

8    ed classes at the high school.

9        Q.    And you didn't agree with that placement?

10       A.    I strongly did not agree with that

11   placement.

12       Q.    Do you know -- were there behavioral

13   issues that led to that placement?

14       A.    M'mm, so, there were, for lack of a

15   better word, comments on my affect that were

16   getting made by my regular teachers.  They would

17   say things like on some days I had a wild look in

18   my eyes.  They would say things like on some days I

19   was allegedly not following directions, going to a

20   different lab table, and there was an assignment

21   status, going to like a single -- like a particular

22   lab table, like in centers.  So there were comments

23   made just on my general affect as a student, and

24   eventually, I think, based on the number of these

25   comments, there was some kind of pressure that was

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 25

```
1    paraprofessional supervision.  Like there were

2    paraprofessionals that would follow me around, and

3    also kind of sit with me and watch me in class.  We

4    actually had a couple of issues where when they

5    would try to redirect me or sit next to me, I felt

6    like I was getting rebuked so many times that I

7    actually became like unresponsive or depressed, and

8    one of my teachers, I wrote her a letter, Ms.

9    Klinect, and she said when she saw that that was

10   happening, she cried, because she felt like I was

11   essentially being oppressed by that placement and

12   it was interfering with my ability to study.  So

13   that was one of the -- one of the aspects of the

14   placement.  The other one was actually getting

15   placed in an alternative classroom, like a guided

16   study active would, which I think was set up for --

17   specifically to house ASD students.

18        Q.   So when did these events involving the

19   IEP occur with you?  Your Freshman year?  Sophomore

20   year?

21        A.   Those began in sophomore year.  They

22   formally terminated in 2014.

23        Q.   Which would have been your junior --

24        A.   Yeah.  Junior year going to hi -- going

25   to senior year.  Like technically terminated right
```

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 27

1    on or --

2        A.    It was sometime in autumn.  Like the fall

3    semester of the sophomore year.

4        Q.    Okay.  So after that the only services

5    you were receiving, I think you said, was a guided

6    study course.

7        A.    M'mm-h'mm.

8        Q.    Is that correct?

9        A.    An ASD guided study placement.

10       Q.    What is -- tell me what that class --

11   what would happen in that class?

12       A.    M'mm, you're asking about the beast,

13   itself.  So I would get heavily scrutinized in a

14   way that students in the general ed classes were

15   not scrutinized.  There were issues where I would

16   ask for things, like to go to the clinic when

17   reporting like flu symptoms and things like that,

18   and my reports would not get acted on.  Like the

19   teachers in that class would not even allow me to

20   go to the clinic, having heard that I had flu

21   symptoms, and, then, later, when I went to the

22   clinic, the clinician essentially noticed I had a

23   fever and let me check out, and, then, later that

24   week, I did not even attend school, because I was

25   so sick with the flu like the remainder of the

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 28

1    week, so there was an environment of like whenever

2    there was a need asserted, there would be pushback

3    and retaliation, and I feel like there was an

4    attempt generally to keep me in there knowing that

5    I protested it and felt that it was inappropriate

6    for my educational placement.

7        Q.    Okay.  So I want to -- I want to talk

8    about that a little bit more.

9            Who were the teachers that were in that

10   class?

11       A.    So there were a couple of different

12   people.  There was Brittney Dewey, who was the

13   guidance study teacher, there was also Ms. Dodson,

14   and there were also a couple of different

15   paraprofessional.  I think one of the

16   paraprofessional's names was Ms. Urban and another

17   named Ms. Ferdinand.

18       Q.    Okay.  Now, you said a moment ago that

19   you felt like they were trying to keep you in that

20   classroom almost because you had -- said you didn't

21   want to be in that classroom.  Help me understand

22   that.  Who is they?  Who do you think were trying

23   to keep you in that classroom?

24       A.    I would think that was the pertinent

25   special ed decision-makers and specifically the

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 35

1    and become like a hindrance to my ability to study

2    and to get work done and to just kind of live and

3    be happy as a student.  I feel like there was a

4    whole phase of life that was getting like

5    challenged by this sort of complex.

6         Q.    What was Ms. Dewey's role with regard to

7    your special education services, exactly?

8         A.    So she was assigned as the IEP Case

9    Manager.  She would have been in charge of

10   instituting the actual policy at the school, which

11   would have controlled which forms of special

12   education treatment that I'd receive.  She also was

13   the guidance study teacher for like sophomore year

14   and junior year, and she also had, within the

15   policy that she had implemented, other functions

16   where whenever she felt that she had an opportunity

17   to intervene somehow, she would come interact with

18   me, even unannounced or unexpectedly, in my other

19   classes.

20        Q.    So you mentioned something about other

21   teachers coming to Ms. Dewey to talk about, I

22   guess, behavioral issues that you were having in

23   her classes.

24              Was that part of her role?

25        A.    That -- that sounds like the

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

1    a file together for that purpose, like when she had

2    taken down like notes about stuff that was actually

3    happening outside of her class after school, like

4    with the orchestra incidents involving a new

5    teacher, Megan Kendall, she put that in her notes,

6    and she was regularly submitting these to the

7    Special Ed Department Chair and to my parents and

8    the administrators, and in her letter she said,

9    please notate that you have this administrative

10   meeting with David.  It will be helpful come time

11   he tries to sign himself out of special education

12   placement.  So I think there were active attempts

13   to like keep me in there knowing that I wanted to

14   be removed.

15       Q.    And what do you think was her motivation

16   for that behavior?

17       A.    I honestly believe it was retaliatory and

18   done for the purpose of diminishing my credibility.

19   I think some of the rationale there was if this

20   diagnosis that she was putting this paper together

21   for existed, it would challenge my credibility, and

22   if my credibility is challenged, her job placement

23   is not jeopardized, and I think that was a lot of

24   the rationale behind her decision-making in that

25   area, and it was just retaliatory treatment and

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 44

```
 1      break?  Would that be okay --
 2             MR. PEREIRA:  Sure.
 3             MR. MASON:  -- with you?
 4             MR. PEREIRA:  Why don't we -- can we come
 5      back at 11?
 6             MR. MASON:  Yeah.  Let's do that.
 7             MR. PEREIRA:  Okay.
 8             MR. MASON:  Let's do that.
 9             MR. PEREIRA:  We're off -- off the
10      record.  Thank you.
11             (A break is taken.)
12  BY MR. PEREIRA:
13      Q.   Now, Mr. Warth, you have testified that
14  you really felt like Brittney Dewey was the reason
15  why you were being maintained in special ed.
16             Is that fair to say?
17      A.   Yeah.  I think my word for it is
18  fabrications she was making about me were the basis
19  for special ed and her efforts, as well, was what
20  she was putting together in the paper record at the
21  school.
22      Q.   And she was sharing that, those
23  fabrications, as you put it, with not only other
24  school administrators, but also with your parents.
25             Is that right?
```

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 48

1      Q.   But your parents, ultimately, between

2  your junior and senior year, did revoke ser --

3  services?

4      A.   Yes.  They sent in a formal termination

5  letter.

6      Q.   Now, your senior year you attended

7  Gwinnett Online Campus.

8           Is that true?

9      A.   I wa -- yes.  I was transferred to

10  Gwinnett Online Campus.

11      Q.   And that was between your junior year and

12  your senior year.

13           Is that right?

14      A.   That was actually in the second semester

15  of the senior year.

16      Q.   Okay.  So first semester senior year, you

17  were still at Brookwood?

18      A.   M'mm-h'mm.  Yes.

19      Q.   But not in Ms. Dewey's class anymore at

20  that point?

21      A.   Correct.

22      Q.   Okay.  Now, did you request a meeting

23  with Mr. Ford and Ms. Dewey?

24      A.   Yes.  That's the February 27, 2015

25  meeting.

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 48

```
 1        Q.   But your parents, ultimately, between
 2   your junior and senior year, did revoke ser --
 3   services?
 4        A.   Yes.  They sent in a formal termination
 5   letter.
 6        Q.   Now, your senior year you attended
 7   Gwinnett Online Campus.
 8             Is that true?
 9        A.   I wa -- yes.  I was transferred to
10   Gwinnett Online Campus.
11        Q.   And that was between your junior year and
12   your senior year.
13             Is that right?
14        A.   That was actually in the second semester
15   of the senior year.
16        Q.   Okay.  So first semester senior year, you
17   were still at Brookwood?
18        A.   M'mm-h'mm.  Yes.
19        Q.   But not in Ms. Dewey's class anymore at
20   that point?
21        A.   Correct.
22        Q.   Okay.  Now, did you request a meeting
23   with Mr. Ford and Ms. Dewey?
24        A.   Yes.  That's the February 27, 2015
25   meeting.
```

**DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.**
**David C. Warth on 10/09/2024**

1    A.    She was very scathing towards me.  She

2    started just rattling her record off to me again.

3    A big "list of incidents," quote, unquote, that she

4    felt were incidents, but which I, just as a

5    student, had said were not, and I -- I was thinking

6    she would say wait, no, I didn't mean to engage you

7    like that over these disciplinary issues, but, no,

8    she very much intended to and a lot of the same old

9    patterns emerged.  She would talk over me.  She

10   would make it clear that if I was going to say

11   something she didn't like, she was going to talk

12   over me again, and that was -- that was the

13   experience with the February 27th, 2015 meeting.  I

14   felt like I did not get a chance to even get a word

15   out at that point.

16       Q.    So is it safe to say you were looking for

17   some closure with Ms. Dewey?

18       A.    Yes.  That is correct.

19       Q.    And you were ready to move on?

20       A.    Yeah.  I wanted the whole thing to be

21   resolved.

22       Q.    And I think I've read some -- somewhere

23   that you've written, might have been in the

24   Complaint, you really felt like Ms. Dewey had

25   really been abusive to you.

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 52

1    like a mediator, but, really, I feel like he

2    limited any sort of discussion which could have

3    happened at that meeting.

4        Q.   Okay.  And do you recall saying at the

5    en -- towards the end of that meeting, that this is

6    not going the way that you had hoped?

7        A.   Yeah.  It was not going the way that I

8    had hoped.  That is correct.

9        Q.   So you did not get any closure after that

10   meeting.

11            Is that fair to say?

12       A.   I really didn't.  That is fair to say.

13       Q.   Now, that meeting was on a Friday, and

14   there was an incident on Monday where you were

15   accused of sort of staring at Ms. Dewey in her

16   trailer.

17            Do you remember that accusation?

18       A.   I remember that accusation, but it's not

19   an accurate characterization of what really

20   happened there.

21       Q.   I want you to tell me what happened.

22       A.   Yeah.  So I had a Latin class directly

23   adjacent to T10, which was Brittney Dewey's

24   trailer, and the Latin class, it was with a

25   teacher, Ms. Lindsey Campbell, it ended, I had gone

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 55

1    being looked at, so I looked over, she then kind of

2    made a disgusted look and went back into her

3    trailer, but it was like a hallway passby, is what

4    it was.

5         Q.   So if it has been reported that you

6    stopped and stared and waited there, that would be

7    incorrect.

8              Is that right?

9         A.   That is inaccurate.

10        Q.   Okay.  Now, during that meeting, I think

11   you talked about Ms. Dewey and expressed to her

12   that you felt like that when she talked to you she

13   used the tone of her voice the way a person who

14   would talk to a dog who peed on the carpet.

15        A.   I'm not sure if that's my exact language,

16   but like a dog is probably a fair characterization

17   of the way that she would speak to me.  I'm not --

18   I'm just not sure if that was my exact language.

19        Q.   Okay.  But that's fairly accurate?

20   Your -- your perception of how she would speak to

21   you?

22        A.   It was --  had a very disciplinary

23   purpose behind it, I would say.  I think it was

24   personally disparaging in a number of ways.

25        Q.   And there was an incident that you

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 58

1      Q.    Okay.

2      A.    -- in that office or outside or ever.

3      Q.    Well, let's talk about this just a little

4   bit.

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 59

1    sometime in March --

2         Q.   Okay.

3         A.   -- of then.

4         Q.   And that was following an argument that

5    you'd had with your parents.

6              Is that true?

7         A.   It was like a -- yeah.  I would say like

8    an argument.

9         Q.   Okay.  And during the argument -- what

10   was that argument with your parents about?  Do you

11   remember?

12        A.   It was about my whole situation, I think.

13   Yeah.  I -- I can tell you.  That evening I was --

14   me and my mom were just kind of going back and

15   forth about her duty as a parent to protect me from

16   abuse, and eventually the situation at the home

17   became heated enough that my dad actually put me in

18   his car and took me over to a band practice at a

19   nearby neighborhood located in Saratoga.  So it's

20   like right off Patterson Road, and I just stayed

21   with my dad throughout that evening for the band

22   practice, and later he had to see me, and he saw

23   that I was distraught, so the next morning he

24   brought me in to see Coats.

25        Q.   Okay.  So did you think that the abuse

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 60

1    that you were talking about with your mom that they

2    weren't protecting you from was Brittney Dewey?

3         A.   It was Brittney Dewey and the actions at

4    the school.  Like with what was going on with Ford

5    and some of the other actors involved in the prior

6    like IEP arrangement.

7         Q.   And did you make a statement to your mom

8    that you wanted to kill Brittney Dewey?

9         A.   I did not make such a statement.

10        Q.   Okay.  Did you make a statement to your

11   mom that you wanted to harm Brittney Dewey?

12        A.   I did not make that statement either.

13        Q.   Okay.  During this whole episode, did you

14   make any statements to your father that you wanted

15   to hurt Brittney Dewey?

16        A.   I did not make such a statement.

17        Q.   Okay.  And did you make a statement to

18   your father that you wanted to kill Brittney Dewey?

19        A.   I did not make such a statement.

20        Q.   Did you put a metronome under the car?

21   Under your parent's car?

22        A.   No.

23        Q.   Do you know -- did your parents report

24   any of those things to Melissa Coats?

25        A.   M'mm --

1        **Q.    If you know.**

2        A.    I think there was conversation about such

3    a thing, and it got construed a certain way; but,

4    no, I did not do such a thing with a metronome.

5        **Q.    Okay.  What did happen with the**

6    **metronome?**

7        A.    Hang on for one second.  Let me get in my

8    phone.

9              When we came in to Meli -- well, not when

10    we came in, just over the course of our sessions, I

11    think a metronome was brought up as a topic of

12    discussion, but as for like taping a metronome to a

13    car, that did not -- no, that did not occur.

14





17        Q.    And, then, she also subsequently made the
18   report to Brookwood High School?

19        A.    Yes.  She subsequently called Brookwood
20   High School and made reports that there was some
21   kind of threat, but it was not like in her office.
22   It was like a speculative event that she was
23   reporting, like from second, third, forth hand.

24        Q.    And just to back up, what led your dad to
25   make the appointment with Ms. Coats that next day?

**DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.**
**David C. Warth on 10/09/2024**

Page 64

1      A.   So when we were at band practice session,

2   he noticed that I was upset.  I felt like my mom

3   had said a number of very hurtful things to me, and

4   he was also concerned about the other distress that

5   I had about the situation at Brookwood, just all of

6   it, really, and when he saw that I was distraught,

7   he, m'mm -- he brought me into that session.

8      **Q.   Okay.  Your conversation with your mom,**

9   **yeah, I think you've testified that that was about**

10  **the situation at Brookwood, primarily.**

11         **Is that true?**

12     A.   Yeah.  It was about the overall

13  situation, it was about her role as parental figure

14  in my life and what she was supposed to do and

15  didn't, and it was just -- it was like arguing,

16  fighting sort of.

17     **Q.   Right.**

18         **Now, at that point, though, were you --**

19  **you had been removed from special ed or no?**

20     A.   Yes.  At that point, I was no longer in

21  special ed at Brookwood.

22     **Q.   So you were no longer having interactions**

23  **with Ms. Dewey at that point on a daily basis,**

24  **correct?**

25     A.   That is correct.

Page 65

1       Q.   So what was the situation at Brookwood

2   that was continuing to cause these issues?  Was it

3   just the iss -- the situation where you were

4   accused to be staring at Ms. Dewey?

5       A.   Yeah.  It was all the internal decisions

6   which were apparently happening about me.  There

7   was some sort of like correspondence with Ford to

8   have him seek me out and confront me in the hallway

9   on the day of, like a couple -- like prior, like

10  right after the February 27th meeting, there was,

11  obviously, that recent meeting, which had occurred,

12  there were the circumstances leading up to the

13  implementation of an IEP that I thought had been

14  wrongful, there was an absence of parental

15  protection, and we were just conversing between

16  ourselves about all of this the night before the

17  Coats's incident, and, then, my father kind of saw

18  that there was like a stare down happening between

19  me and mom, he removed me from the home and took me

20  to the band practice.

21      Q.   Okay.  So you never left the presence of

22  your mom and dad -- your dad that day?  You were

23  always with your dad.

24           Is that right?

25      A.   When he found -- when he -- when he found

1  me distraught, he took me to band practice, and I

2  stayed in his presence for the remainder of that

3  day.  That's correct.

4      **Q.  But, initially, you left the house,**

5  **correct?**

6      A.  I took about like two steps out the door,

7  and he happens to be in the area.  He was like --

8  he had like band equipment with him, like a guitar,

9  and said that he was like going to band practice.

10 What are you doing?  And, then, he just said you

11 want to come in the car?  I was like sure, and I

12 went in the car, and, then, we went to the other

13 home at -- at Saratoga.

14     **Q.  Did he ask you where you were going?**

15     A.  No.  He just said you want to get in the

16 car, and I was like sure.

17     **Q.  So you never told him I'm goi -- you know**

18 **where I'm going?**

19     A.  No.

20     **Q.  Okay.  All right.**







DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 70

1    ███████████████████████████

2         Q.    Okay.  Was there a hearing on that

3    temporary restraining order that Ms. Dewey got back

4    in 2015?

5         A.    There was some kind of court appearance

6    about that.

7         Q.    And you were there?

8         A.    I was present.

9         Q.    Okay.  And at that hearing the judge

10   granted the one year temporary restraining order.

11              Is that correct?

12        A.    I think it is.  I'm not sure how

13   qualified I am to answer legal questions, but there

14   was some kind of order at the end of that hearing.

15        Q.    Okay.  And after that TRO you continued

16   to attend Brookwood High School until -- when did

17   you say you went to GO Online Campus?

18        A.    I was transferred there, I think, between

19   March and April 2015.  So this was after -- this

20   was after all the events with Lakeview, which we've

21   discussed so far, so around like April is when I

22   went to GOC.

23        Q.    Now, when you talked about this a moment

24   ago, you indicated that the Gwinnett County Schools

25   made the decision.

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 71

1              So it wasn't your decision to go to the

2    online campus?

3         A.   It was a weird administrative decision

4    that involved Ford, and I think a couple other

5    departments, as well.  Essentially, they were

6    trying to mandate that I go to GOC or they were

7    going to pursue some sort of due process hearing to

8    have me removed from the school, is what I think

9    Ford's mandate was, and from there I got

10   transferred over to GOC, and I -- I -- we're not

11   pleased with the overall situation.

12        Q.   So it was sort of an ultimatum, it sounds

13   like.  If you don't go to GOC, then we're going to

14   take action to make you go.

15              Is that fair?

16        A.   Yeah.  Like an ultimatum.

17        Q.   Okay.  And you did graduate from Gwinnett

18   Online Campus.

19              Is that true?

20        A.   Yep.  I was, in theory, their

21   Valedictorian by GPA average.

22        Q.   Okay.  So was there anything that

23   happened while you attended Gwinnett Online Campus

24   regarding Brookwood High School or Ms. Dewey?

25        A.   Actually, no.  After the ultimatum from

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 72

1    Ford, they kind of went silent.

2         Q.    Okay.  So you graduated in the spring,

3    and, then, if I'm not mistaken, you attended Emory

4    University.

5               Is that right?

6         A.    That is correct.

7         Q.    Okay.  And did -- did you move in on

8    campus?

9         A.    Yeah.  I was staying on campus.

10        Q.    Okay.  And what were you going to study?

11        A.    I was a music composition and computer

12   science major.

13        Q.    Okay.  So a double major?

14        A.    Yeah, double major.

15        Q.    And at Emory did you have any

16   accommodations or special education supports?

17        A.    I didn't really have anything like that

18   through the university, itself.  I was going to a

19   private counselor, Dr. Segal, but in terms of a

20   formal university accommodation, I did not have

21   anything like that.

22        Q.    Okay.  And what dorm did you live in at

23   Emory?

24        A.    I was at Dobbs Hall.

25        Q.    Did you have a roommate?

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 91

1      A.    Yes.

2          Q.    Okay.  And you started the day on

3    September 6th by going to the CVS on Dogwood Road

4    and Five Forks Trickum Road.

5              Is that true?

6      A.    Yes.  I was transported there by an Uber,

7    showed up at the CVS, and basically went in CVS.

8          Q.    Now, were you transported from the Uber

9    from your parent's house or from the dorm?

10     A.    It was from the dorm.

11         Q.    Okay.  So you took an Uber to the CVS.

12   And why did you go to the CVS?

13     A.    The person said they could only drop me

14   off like there, but like not all the way, and,

15   then, I -- I was like fine.  I can just go at the

16   CVS here.  Please let me out.  Please let me out.

17   And it -- I just wound up at the CVS.

18         Q.    So when you ordered the Uber, you'd

19   ordered it to go where?

20     A.    I was going to the vicinity of Brookwood

21   High School.

22         Q.    Ordinarily when you order an Uber, put a

23   location in, it doesn't give you the option for a

24   vicinity.

25              Did you put Brookwood High School in the

**DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.**
**David C. Warth on 10/09/2024**

Page 93

```
 1   why I was there until I got into the building, and
 2   the gloves were there primarily to prevent paper
 3   cuts, like when I was planning on handling paper,
 4   and this is -- this is like the logic that like
 5   minor David was thinking through that day, in terms
 6   of just each little act, but that -- that's why I
 7   bought what I did at the CVS and why I approached
 8   in school in the manner in which I did.  It was to
 9   protect my privacy, and also to protect disclosure
10   of the reason, specific records I was looking for,
11   until we got -- until I got into the building.
12        Q.   Okay.  So at this point on September 6th,
13   2016, you had been told by Brookwood High School
14   they didn't have any of your records, and you did
15   not make an appointment to see anyone at Brookwood
16   High School on that day.
17             Is that correct?
18        A.   That is correct.
19        Q.   Okay.  And you went into the CVS, and you
20   purchased the neoprene gloves and a hat.
21             Is that correct?
22        A.   Yes.
23        Q.   And you had brought with you a costume
24   beard and a hair net?
25        A.   Yes.
```

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 94

1      Q.   And glasses.

2           Is that true?

3      A.   Yep.

4      Q.   Okay.  And when you came out of -- you

5  went into the restroom at CVS.

6           Is that true?

7      A.   Yes.

8      Q.   You asked someone there if you could use

9  the restroom?

10     A.   Yep.

11     Q.   And they let you into the restroom, and

12  when you came out of the restroom, you had on the

13  costume beard, sunglasses, the gloves, the hat, and

14  the hair net, and a Brookwood High School T-shirt.

15          Is that true?

16     A.   Yes.

17     Q.   Okay.  Why did you have the gloves on

18  when you were still several blocks away from

19  Brookwood High School and certainly in no close

20  proximity to any paper at that point?

21     A.   Because that was the time that I was

22  putting all the clothes on.  I felt like the

23  opportunity to do that would have just been in the

24  bathroom at the CVS, so that was the opportunity I

25  took to put all the clothing on.

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 95

1    Q.    Okay.  And what route did you travel to

2  get to Brookwood High School from the CVS on

3  Dogwood Road and Five Forks Trickum?

4    A.    So I walked from the CVS down the

5  sidewalk leading to the high school.  I eventually

6  arrived at the grounds.  I started to get a little

7  bit of internal tension being at the front of the

8  school, so I -- I didn't want to go in directly.  I

9  kind of veered off to the side and actually became

10  lost while I was doing this, cause I got to a part

11  of the campus I had not previously been to, like

12  with some football fields and that place.

13         Eventually a guy in a golf cart, who

14  later -- I think he said his name was Mr. Torres,

15  he showed up to me, he started asking me why was I

16  there at the campus, I -- based on the disclosure

17  issue, I was explaining to, I did not want to tell

18  him why I was there or my identity, and, then, I

19  felt affronted enough by his questions, when he

20  started mentioning police that I said, I would like

21  to depart, so I then turned around, and I exited

22  the Brookwood campus, I moved along the sidewalk

23  leading over to Hutch Lane at the high school, and

24  that's where I was confronted by the golf cart guy

25  and Gammon and later Mr. Williamson showed up, and

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

1  not sure I would go as far to say as people were
2  necessarily deliberately hiding things from me, but
3  I felt like there was more there than I was being
4  given.
5      Q.   Now, you were stopped in one of the
6  neighborhoods outside of Brookwood.
7           Is that right?
8      A.   Yeah.
9      Q.   Do you know the name of the street you
10 were stopped on?
11     A.   That was Hutch Lane.
12     Q.   Okay.  And who stopped you?
13     A.   The guy on the golf cart, Mr. Torres,
14 and, also, somebody else, the Resource Officer,
15 Mr. Gammon.
16     Q.   Okay.  Did Mr. Gammons pull up in a
17 police vehicle or was he in the cart with
18 Mr. Torres?
19     A.   I'm not sure if he was in his own cruiser
20 or if he was in the actual golf cart, itself, but I
21 think more police cruisers arrived on Hutch Lane,
22 but as for Mr. Gammon, he was either in the golf
23 cart or in a cruiser, like one of the two, but I
24 know he eventually showed up with Mr. Torres like
25 at the end of.

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 122

```
1        Q.   And tell me what happened during that
2   interaction.
3        A.   They started asking me questions, and I
4   was responding in such a way so as to not disclose
5   what I was trying to protect, and that was my
6   identity and my reason for visiting the school.
7        Q.   So they asked you repeatedly to tell them
8   what your name was.
9             Is that true?
10       A.   Yes.
11       Q.   And you refused to give them your name.
12            Is that right?
13       A.   Correct.
14       Q.   At this time, you're still wearing the
15  disguise.
16            Is that correct?
17       A.   The beard and the hat and stuff, correct.
18       Q.   And did you ask to speak with an
19  attorney?
20       A.   I think I did, actually.
21       Q.   And did Mr. -- Officer Gammons actually
22  give you his cell phone to allow you to call
23  several attorneys?
24       A.   Yes, he did.
25       Q.   Okay.  And was the first attorney you
```

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 124

```
 1   call several, but I was able to get in touch with

 2   Attorney Macklyn Smith, I think his assistant.

 3   Like he's a separate lawyer that I just personally

 4   know like from family, from like the Lawrenceville

 5   area, who does like civil practice, and I reached

 6   his clerk, and I explained the situation to them,

 7   and I asked if he could help.

 8       Q.   But, suffice it to say, you never

 9   provided the officers with your name or any reason

10   for being on Brookwood High School campus.

11            Is that true?

12       A.   That is true.

13       Q.   And at some point, I think you testified

14   that some other officers arrived.  Were those

15   Gwinnett County police off --

16       A.   Yeah.  Yeah.  It was Gwinnett PD.

17       Q.   Okay.  Were you aware that the clerk at

18   the CVS had called the police when you came out of

19   the restroom and left the CVS?

20       A.   I was not aware of that.

21       Q.   Okay.  And at some point Officer

22   Williamson also arrived on the scene.

23            Is that true?

24       A.   Yes, he did.

25       Q.   Okay.  And you were arrested at that
```

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 125

1   point.

2           Is that right?

3       A.   Yes.   Shortly afterwards they showed up,

4   he placed me under arrest for criminal trespass.

5       Q.   And they conducted sort of an inventory

6   search of your person at that time.

7           Is that right?

8       A.   Yeah.   He did.

9       Q.   And did you then go to the Gwinnett

10  County Jail?

11      A.   Yes.   They put me in a squad car, they

12  basically brought me out to the front of the

13  school, like where Mr. Ford was and Ms. Martin was.

14  She was kind of looking at me like almost tearful

15  while that was happening.   I made a bit of a

16  statement to her, I wanted her to help, and, then,

17  they took me off to the Gwinnett Sheriff's Office,

18  and, then, just booked me in the front.

19      Q.   Okay.  So when they took you to the front

20  of the school, you said Bo Ford, the Principal, and

21  who else was there?  Ms. Martin?

22      A.   Yeah.   There was a prior administrator

23  who just kind of knew me.  She was there, as well,

24  and they both like came out, and when she looked at

25  me, I interpreted her facial expression that she

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 126

1    was sad about what was happening to me, and I kind

2    of -- I let out like a word to her like help, kind

3    of anguished, from the back of the squad car, and,

4    then, from there, I was brought by Williamson to

5    the GCSO.

6         Q.   Okay.  And you were processed in there?

7         A.   Yes.

8         Q.   Were you told what you were being charged

9    with?

10        A.   They said criminal trespass.

11        Q.   And did you bond out?

12        A.   I bonded out.  Yeah.

13        Q.   How long were you there before you bonded

14   out?

15        A.   I was there for about two days.

16        Q.   Now, do you know why it took so long for

17   you to bond out?

18        A.    I was having trouble getting on the

19   phone.  When they took me into the facility, I was

20   actually brought to ISO seg, which is a room that's

21   empty, with a cement floor, and there is not a

22   phone or way of really contacting anybody from that

23   room.  They held me there for about three or four

24   hours, and, then, I was brought, by the deputies

25   who were with me, over to J Unit, which is a

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 127

1  separate, isolated unit, they call that 24 ISO,

2  inside the Gwinnett Detention Center, and while I

3  was in there, you're basically locked in a room for

4  like 24 hours or 23 hours a day with only the

5  opportunity to go out and shower, so I was having

6  trouble getting access to a phone, but I kept

7  asking can I please use the phone, can I please use

8  the phone, can I please use the phone when the

9  deputy would do his rounds for that unit, and

10  eventually very late in the day, he actually gave

11  me the phone, and that was when I actually called

12  various bonding agencies and also tried to get in

13  touch with Brian and Deb Warth, and eventually I

14  got on the phone with a bail bonding agency, who

15  contacted them on my behalf, they made some

16  arrangements for the bonds and for the, m'mm -- for

17  the attorney, and eventually I went into court, I

18  was informed that Attorney Winfrey would be

19  assisting me, so he chatted with me about having

20  the bond posted, he eventually got it posted, and,

21  then, I left the facility.

22      Q.   So you think it was the next day after

23  you'd been arrested.  So you spent one night in

24  custody?

25      A.   I think it was one night.  Like the next

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 129

1    charges for trespassing at Brookwood High School.

2         Is that correct?

3    A.    Yes.    That's correct.

4    Q.    And Mr. Winfrey was he appointed or did

5    you hire him?

6    A.    He was private, not appointed.

7    Q.    Okay.   All right.

8         And you were eventually charged in that

9    case with stalking, trespass, and wearing a mask.

10        Is that correct?

11   A.    Those charges were later added.  I don't

12   think they were there like at the jail, but later,

13   like, I think they got added.

14   Q.    The solicitor ultimately added those

15   charges.

16        Is that your understanding?

17   A.    Yes.

18   Q.    Okay.  But Officer Williamson charged

19   you, initially, with trespassing.

20        Is that true?

21   A.    Yes.

22   Q.    Okay.  Now, do you recall that following

23   that arrest there was a second temporary

24   restraining order that was sought by Ms. Dewey?

25   A.    Yes.

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 140

1   do that or you acknowledge that you did tell the

2   judge you intended to enter that plea?

3       A.    I think this was a response to Ms. Scaco,

4   what you're asking about here.

5       Q.    The bottom of this page, The Court:

6   Mr. Warth, you are pleading guilty --

7       A.    There it is.

8       Q.    -- to Alford versus North Carolina, the

9   stalking, criminal trespass, and wearing a mask.

10  Is that right?  Answer:  Yes.

11      A.    Okay.  That is my statement there, but

12  it's -- it wasn't -- it wasn't like an actual

13  intent to plead at that point, because we had

14  another immediate motion withdrawing it, is what we

15  had, so it's like we started in court, they then

16  had other concerns, and he said he's going to take

17  it under consideration, and, then --

18      Q.    Respectfully, this hearing was on the 9th

19  day of February, 2017.  I don't believe you filed

20  your Motion to Withdraw the Plea until June of

21  2017.

22            Isn't that true?

23      A.    Attorney Winfrey did something at that

24  point.  I'm not sure what his -- what his exact

25  process was, but we said that it wasn't really an

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 147

```
 1   was no other arrest warrant that would have held

 2   you in custody, right?

 3        A.   I think that's correct.  I think we

 4   talked about the March 24th warrant.

 5        Q.   Right.

 6             So between February 9th and March -- you

 7   said the date was what date?  Did he get the

 8   warrant March 24th?  21st?

 9        A.   That -- that's when they rebooked me --

10        Q.   Okay.

11        A.   -- with the warrant.

12        Q.   But you were in jail when they rebooked

13   you.

14             Is that right?

15        A.   Yes.

16        Q.   Okay.  And you were already in jail

17   serving on this sentence that you pled guilty to,

18   that you would ultimately withdrew.  I understand.

19        A.   I -- I've had several attorneys say you

20   did not plead guilty to that.  If anybody asks, you

21   may lawfully answer no.  I've been advised to

22   answer that.  I believe that the record you're

23   holding there is invalid.  Like it's been vacated,

24   dismissed by the courts.  It's not a final plea.

25        Q.   Now, you've testified that there was a
```

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 148

1    subsequent arrest warrant that was taken out by

2    Officer Williamson, and you received notice of that

3    while you were incarcerated.

4            Is that right?

5       A.   Yes.  They did the rebooking on March

6    24th, 2017.

7       Q.   Okay.  And I think you testified when you

8    received that information you were in the Gwinnett

9    County Jail already.

10           Is that true?

11      A.   Yeah.  I was -- they had like a separate

12   annex that I was at, and, then, they told me there

13   was a warrant, so they brought me back to booking

14   and did the booking there.

15      Q.   Okay.  And do you remember, after that

16   booking, were you taken into a courtroom a few days

17   later for a preliminary hearing on that new

18   warrant?

19      A.   I believe so.  I think that is correct.

20      Q.   And do you remember if you had an

21   attorney named Lyle Porter that was representing

22   you at that time?

23      A.   Yes.

24      Q.   Okay.  And at that hearing do you

25   remember did Officer Williamson testify?

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

Page 149

1        A.    Yeah.   He showed up at that hearing.

2        Q.    Okay.   And do you remember did your

3    attorney, Lyle Porter, cross-examine Officer

4    Williamson?

5        A.    He started asking Williamson a lot of

6    questions, so I think that was cross-examination.

7        Q.    Do you remember what Officer Williamson

8    said to support the probable cause finding for that

9    arrest warrant?

10       A.    General --

11       Q.    If you don't remember, that's fine, but

12   do you remember did he tell the judge that there

13   was an E-mail that was sent?

14       A.    I remember he spoke for a really long

15   time, but the exact contents of his statements,

16   I -- it's kind of like blurry for me, cause it's --

17   like it was a lot.

18       Q.    Okay.   And at that time was that hearing

19   held over at the courthouses at the jail?

20       A.    Yeah.   I think it was in the -- in a

21   court building.

22       Q.    Okay.   And that's because you were still

23   incarcerated at that time, correct?

24       A.    Correct.

25       Q.    Okay.   And do you remember did the

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

1    previously been entered.  I think the judge's order

2    on that was around August 2017.

3           Does that sound correct?

4       A.    It was sometime after I was at the GCSO.

5    Like it's kind of hard for me to tell time in such

6    an unstructured environment --

7       Q.    Okay.

8       A.    -- but that sounds, more or less, like

9    when that occurred.

10      Q.    And, then, from that point, on, you were

11   pending trial for allegations related to the

12   threats made to Ms. Dewey.

13          Is that right?

14      A.    It was within March 24th -- yeah, March

15   24th, 2017.  I think that was the warrant.  Either

16   March 14th or March 24th, 2017 of that warrant.

17      Q.    Those charges, right?  That were part of

18   that warrant, and, then, were subsequently brought

19   before a judge for the probable cause hearing?

20   That same -- those new charges?

21      A.    It -- it was that warrant.

22      Q.    Okay.  And were you indicted?  Did you

23   receive an indictment?

24      A.    I think so.  And when I -- when I asked

25   the sheriff's deputies at the GCSO why am I here?

DAVID C. WARTH vs GWINNETT COUNTY PUBLIC SCHOOLS, ET AL.
David C. Warth on 10/09/2024

```
 1        Q.   All right.  And if you look down to No.
 2   6, it says, the IP address 91103.4.74 was not
 3   associated with the TOR network within 24 hours of
 4   February 6th, 2017.
 5             Is that right?
 6        A.   That is what that says.  Correct.
 7        Q.   So it doesn't say that the E-mail did not
 8   come through the TOR network.  It says that your IP
 9   address was not used within the 24 hours of when
10   that was sent, correct?
11        A.   That -- that -- that is not my IP address
12   on there.  That is an Ireland IP address.  I have
13   no affiliation with this.  I've not ever contacted
14   anybody, to my knowledge, from Ireland.  I've not
15   ever been to Ireland.
16        Q.   Okay.  So you think this IP address has
17   nothing to do with you at all?  This is another IP
18   address that we just used on that E-mail?
19        A.   Or -- well, I think that's an Ireland IP
20   address.  It has not pertinence to me at all.
21   Correct.
22        Q.   All right.  Well, thank you for helping
23   me understand that.
24             All right.  Now, you testified that you
25   subsequently withdrew your guilty plea that had
```



1      Q.    If you know.

2      A.    I think there was conversation about such

3   a thing, and it got construed a certain way; but,

4   no, I did not do such a thing with a metronome.

5      Q.    Okay.  What did happen with the

6   metronome?

7      A.    Hang on for one second.  Let me get in my

8   phone.

9            When we came in to Meli -- well, not when

10  we came in, just over the course of our sessions, I

11  think a metronome was brought up as a topic of

12  discussion, but as for like taping a metronome to a

13  car, that did not -- no, that did not occur.

14  ███       █████████████████████████████████████

██  ████████████████████████████████████████████████

██  █████████████████████████████████████████████

██  █████████████████████

██     ███    ████████████████████████████████████

██  ██████████████████████████████████████████████

██  ████████████████████████████████████████████████

██  ███████████████████████████████████████████

██  ██████████████████████████████████████████

██  █████████████████████████████████████████████

██  ████████████████████████████████████████████████

██  ███████████████████████████████████████████